<p style="text-align:center; color:red;">CORRECTED</p>

# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 18-0291V
UNPUBLISHED

|  |  |
|---|---|
| GARY SMALLWOOD,<br><br>                Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: April 29, 2020<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Ruling on Entitlement; Table Injury; Findings of Fact; Onset; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |

*Amber Diane Wilson, Wilson Science Law, PA, Washington, DC, for petitioner.*

*Lisa Ann Watts, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION AWARDING DAMAGES[1]

On February 26, 2018, Gary Smallwood filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a left shoulder injury related to vaccine administration ("SIRVA") attributable to the influenza ("flu") vaccine he received on November 6, 2016. Petition at ¶¶ 1,12-13. Petitioner further alleges that he received the flu vaccine in the United States, suffered the residual effects of his injury for more than six months, and that neither he nor any other individual has filed a civil action or received

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the decision will be available to anyone with access to the internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

compensation for his injury. *Id.* at ¶¶ 1, 14, 16-17. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons described below, I find that Petitioner is entitled to compensation in this case, and award damages in the amount of **$72,500.00**, **representing compensation only for actual his actual pain and suffering.**

## I.     Procedural History

Shortly after the case's initiation, Mr. Smallwood filed the medical records required by the Vaccine Act. *See* Exhibits 1-7, filed Mar. 2, 2018, ECF No. 7; *see also* § 11(c)(2) (for a description of the required medical records). The initial status conference was held in April 2018.

In November 2018, Respondent indicated he "wishe[d] to explore the possibility of settlement." Status Report, filed Nov. 13, 2018, ECF No. 16. Over the subsequent nine months, the parties engaged in settlement discussions. *See, e.g.,* Status Report, filed Mar. 28, 2019, ECF No. 24 (indicating Petitioner conveyed her settlement demand to Respondent that day).

In August 2019, Petitioner filed a joint status report on behalf of the parties stating that they "ha[d] reached an impasse in [their] settlement discussions." Status Report, filed Aug. 9, 2019, at ¶ 1, ECF No. 33. Petitioner added that he had submitted this case for a new test program being implemented by then-Chief Special Master Dorsey[3] and planned to file a motion requesting factual findings which he believed would help move the case along. Status Report at ¶¶ 2-3, ECF No. 33. After the case was accepted into the test program, Petitioner requested that the deadline for his motion for factual findings be stayed. ECF No. 36. Petitioner's motion was granted. Non-pdf Order, issued Sept. 24, 2019. Petitioner filed updated medical records from his chiropractor on October 22, 2019. *See* Exhibit 8, ECF No. 37.

The parties participated in a neutral evaluation in November 2019. *See* Status Report, filed Dec. 23, 2019, at 1, ECF No. 40 (joint status report from the parties providing a comprehensive update on the neutral evaluation and subsequent efforts of the parties).

---

[3] In 2019, 25 cases were selected by the parties to participate in a "Pilot-100" or "P-100" program designed to facilitate the settlement of these cases. Under the P-100 program, these cases were scheduled for neutral evaluation before a third-party neutral consistent with the U.S. Court of Federal Claims Procedure for Alternative Dispute Resolution. *See* Rules for the Court of Federal Clams ("RCFC") app. H. The P-100 program was overseen by then Chief Special Master Dorsey and me. I was appointed Chief Special Master on October 1, 2019. The neutral evaluations were performed in late 2019, and the P-100 program was terminated in January 2020.

During the neutral evaluation, it was suggested that additional information might help the parties informally settle the case. "On December 9, 2019, Petitioner sent an updated settlement offer and provided copies of emails to [R]espondent that he believed could form the basis for witness statements in support of his claim." *Id.* Petitioner volunteered to obtain "formal signed witness statements if Respondent [wa]s willing to update his settlement position and engage in further settlement discussions." *Id.* at 1-2. After Respondent failed to express a willingness to update his settlement position, however, Petitioner proposed to file a motion for a ruling on the record. *Id.* at 2.

In January 2020, Petitioner filed additional affidavits, other documentation to support his claim, and a medical article[4] regarding his purported SIRVA injury. *See* Exhibits 9-15, filed Jan. 9 and 14, 2020, ECF Nos. 41, 43. Petitioner also filed a motion for a ruling on the record as it now stands, requesting that I find he is entitled to compensation in the amount of $85,000.00 for his actual pain and suffering. Petitioner's Motion for Findings of Fact and Conclusions of Law ("Pet. Motion") at 1, ECF No. 42; Memo in Support of Pet. Motion ("Pet. Memo") at 1, ECF No. 42-1. The case was thereafter removed from alternative dispute resolution ("ADR"). Non-pdf Status Conference Orders issued Jan. 15 and 21, 2020; Order Removing Case from ADR, issued Jan. 23, 2020, ECF No. 45.

During a status conference call held on February 3, 2020, Petitioner's counsel confirmed that Petitioner wished me to decide the issues of entitlement and damages in a written decision. Counsel provided estimations for the amount of time needed for Respondent's response and a reply thereafter from Petitioner.

On January 28, 2020, Respondent filed his response. Respondent's Brief in Response to Petitioner's Motion for Summary Judgment ("Res. Brief"), ECF No. 46. One week later, Petitioner filed a reply. Petitioner's Reply ("Pet. Reply"), ECF No. 47.

Because Petitioner provided a receipt for the cost of his January 13, 2017 MRI to support his argument that he often did not seek medical treatment due to financial concerns[5] but did not request compensation for any unreimburseable expenses, Petitioner's counsel was asked to confirm again, by email correspondence, that Petitioner was requesting a decision awarding damages, rather than a ruling as to the appropriate amount of compensation for his actual pain and suffering. *See* Informal Remark, dated Apr. 13, 2020. Petitioner's counsel confirmed again that Petitioner wished me to issue a

---

[4] S. Atanasoff et al., *Shoulder injury related to vaccine administration (SIRVA)*, 28 Vaccine 8049 (2010) filed as Exhibit 14.

[5] Referencing this receipt in his memorandum, Petitioner indicated that "the cost for his recent MRI was already hindering him financially." Pet. Memo at 15.

damages decision awarding the compensation requested, $85,000.00 for his past pain and suffering.

Petitioner's motion is ripe for adjudication.

## II.    Factual History

### A.  Medical Records

Prior to vaccination, Petitioner suffered from hypertension and diabetes from at least 2011 to the present. Exhibit 2; Exhibit 4 at 45. During 2015-16, he was seen routinely (every four months) by Ricky Page, M.D., at the Oklahoma City Clinic for follow-up appointments regarding these conditions. Exhibit 2 at 28, 25, 23, 21, 19, 17 (from oldest to most recent visit).

From 2011 to the date of vaccination, Petitioner visited the Intermountain Dixie Regional Medical Center for his urgent care. *See* Exhibit 4. In the fall of 2011, he visited the emergency room twice, complaining of left flank pain. *Id.* at 53, 144. The cause of Petitioner's pain was determined to be kidney stones, requiring surgery in October 2011. *Id.* at 45, 89. In 2013, he suffered a laceration and fracture of a finger on his left hand. *Id.*

Petitioner received the flu vaccine alleged as causal at a Walgreens Pharmacy on November 6, 2016. Exhibit 1. The vaccine record indicates the vaccination was administered in Petitioner's left arm as alleged. *Id.* at 4.

On December 30, 2016, Petitioner visited an orthopedist, Bradley Margo, M.D. at McBride Orthopedic Hospital in Oklahoma City, complaining of "left shoulder pain since the flu shot in the beginning of November." Exhibit 3 at 10. He described "pain on the outside part of his shoulder" and reported an inability to raise his arm above his head. *Id.* After examination, Dr. Margo noted that Mr. Smallwood's rotator cuff felt strong but that he did "have a positive Jobes[6]" result. *Id.* at 10-11. He further noted that Petitioner exhibited full abduction and "forward flexion to just past 100 degrees with pain." *Id.* at 10. Dr. Margo administered a subacromial steroid injection. *Id.* at 11.

Petitioner returned for further treatment on January 6, 2017. Exhibit 3 at 8. He reported "the injection helped for a little bit, [that] [t]he pain was getting better then started

---

[6] The lateral Jobe test is a method used to diagnose rotator cuff tears. *See* J. Gillooly et al., *The lateral Jobes test: A more reliable method of diagnosing rotator cuff tears*, 4(2) Int. J. Shoulder Surg. (2010) posted on the National Institutes of Health website at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2966749 (last visited Apr. 28, 2020).

to come back." *Id.* Rating his strength and ability to use his arm as "a little better," Petitioner estimated that his level of pain was the same. *Id.* He described an occasional catch when moving his arm and indicated that he "really ha[d] a tough time using [his arm] away from his body or overhead." *Id.* Dr Margo ordered an MRI. *Id.*

The results of the MRI, performed on January 13, 2017, revealed a small full-thickness tear of the distal supraspinatus tendon, a small partial-thickness tear within the infraspinatus tendon, and evidence of tendinosis and some degenerative changes. Exhibit 3 at 6-7. The MRI also showed what "appear[ed] to be a . . . fluid level within the sub coracoid bursa suggesting blood products from prior hemorrhage." *Id.* at 7.

After reviewing the results of the MRI, Dr. Margo diagnosed Petitioner with a left shoulder rotator cuff tear and recommended that he undergo arthroscopic surgery. Exhibit 3 at 5 (record of Petitioner's third visit to Dr. Margo on January 17, 2017). He indicated Petitioner's recovery would be at least four months, consisting of a sling for four weeks, physical therapy ("PT") to start two weeks after surgery, and an inability to lift anything for two to three months. After examining Petitioner, Dr. Margo observed mid-range weakness but no tenderness at his AC joint and an ability to "get to full extension." *Id.*

It appears Petitioner did not pursue further treatment of his left shoulder pain or seek medical treatment for any other condition until he saw Kiran Sahota, a nurse practitioner at Faith Immediate Care & Occupational Medicine in Springfield, Missouri, on November 3, 2017. Exhibit 5 at 4-6. At that visit, he requested a PT referral for his left shoulder pain, described as severe, sharp, and constant. *Id.* at 4. Petitioner reported that he had suffered his left shoulder pain and limited range of motion ("ROM") for approximately one year, since receiving the flu vaccine in January 2017.[7] *Id.* at 4, 6. He recounted the treatment he had received in Oklahoma City from Dr. Margo, including the steroid injection, the results from his January 13, 2017 MRI, his diagnosis of a rotator cuff tear, and the recommendation of arthroscopic surgery. *Id.* at 4, 6. Petitioner indicated his current work required only light physical activity and that he did not require a note indicating he needed to restrict his duties. *Id.* at 5-6. He was instructed to apply heat and ice and take Aleve for his pain. *Id.* at 6. After reviewing Petitioner's medical records from his earlier treatment and the results of his January 13, 2017 MRI, Kiran Sahota ordered the PT requested by Petitioner. *Id.* at 6.

From mid-November through mid-December 2017, Petitioner attended seven PT sessions. Exhibit 6. At his first session on November 15, 2017, Petitioner complained of left shoulder pain and stiffness since receiving the flu shot in November 2016. *Id.* at 16.

---

[7] Since the time frame between vaccination and the current date in the record from this November 3, 2017 visit is described as one year, it appears the notation indicating Petitioner's vaccination occurred in January 2017, rather than November 2017, is a simple mistake.

He described his pain as "sharp, shooting, and [a] dull ache," rating his level of pain as 0 out of 10 at best and 10 out of 10 at worst. *Id.* Petitioner reported that his symptoms were aggravated when reaching left or right, overhead or behind his back and improved by pain medication and rest. *Id.* The physical therapist, Seth Owens, DPT, assessed Petitioner as having "significant limitation in ROM, pain, and weakness in his (L) shoulder after (L) RTC[8] tear." Exhibit 6 at 19. He recorded that Petitioner's "stated goal is to avoid surgery if at all possible due to his job demands and the prolonged immobilization associated with RCR[9]." Exhibit 6 at 19.

At his second PT session, Petitioner reported that his home stretching exercises were going well and that his current pain (after work) was 6-7 out of 10. Exhibit 6 at 14. He was assessed as exhibiting good improvement in his ROM. Although still being terrified to move his arm, Petitioner was pleased to be able to stretch without his shoulder popping. Dexamethasone[10] was applied by iontophoresis patch.[11] Exhibit 6 at 14.

By his next PT session on November 28, 2017, Petitioner's pain level had improved to 5 out of 10. Exhibit 6 at 12. He "ha[d] greatly reduced his guarding behaviors and [wa]s progressing well with assisted motions through full ROM." *Id.* He was again assessed as showing "good improvement in his ROM post session." *Id.*

Over the next three PT sessions, Petitioner's pain levels decreased from 5 to 3 or 4 out of 10, and he continued to show great improvement in his ROM. Exhibit 6 at 10, 8, 6 (in chronological order). He continued to receive dexamethasone patches. *Id.* At his fifth visit on December 5, 2017, Petitioner was encouraged to begin strengthening exercises. *Id.* at 8. By his sixth visit on December 7, 2017, Petitioner was reporting no additional pain post session. *Id.* at 6.

At his last PT visit on December 14, 2017, Petitioner indicated that he felt "60% better overall." Exhibit 6 at 1. Reporting "better ROM and less pain overall," he indicated that his current pain was at a level of 0 out of 10 and that after a full day at work, his pain level was no more than 4 out of 10. *Id.* Petitioner estimated that the functional use of his

---

[8] RTC stands for rotator cuff. MEDICAL ABBREVIATIONS at 526 (16th ed. 2020).

[9] RCR most likely means rotator cuff repair. MEDICAL ABBREVIATIONS at 510.

[10] Dexamethasone is "a synthetic glucocorticoid, 25 times as potent as cortisol; used topically on the skin and conjunctiva as an anti-inflammatory." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 504 (32th ed. 2012).

[11] Iontophoresis is "the introduction by means of the electric current, of ions of soluble salts into the tissues of the body, often for therapeutic purposes." DORLAND'S at 958.

arm had improved to 75%. *Id.* As he had met all PT goals, Petitioner was discharged and advised to continue his home exercises. *Id.* at 2-3.

In 2018, Petitioner twice received treatment for lower back pain and right sacroiliac[12] joint pain from Marcel Popa, DC, a chiropractor at North Springfield Family Chiropractic, LLC in Springfield Missouri. Exhibit 8. At his initial visit on February 12, 2018, Petitioner reported severe symptoms which came on suddenly and impede his ability to work and sleep. He described his lower back pain as sharp and located on his right side. At his second visit on August 3, 2018, Petitioner indicated that his pain had improved but then worsened following his initial visit. *Id.* at 12. There is no mention of left shoulder pain in the medical records from either of these visits. No additional medical records have been filed.

### B. Affidavits and Other Documentation

Mr. Smallwood filed two affidavits on March 2, 2018, and January 9, 2020. Exhibits 7, 9. In his first affidavit, he asserted that prior to vaccination he "was in good health and had no injuries involving [his] left shoulder." Exhibit 7 at ¶ 5. In both affidavits, he alleged that his left shoulder pain "started immediately after the vaccine was injected and continued to progress and become worse over the next two days." Exhibit 7 at ¶ 6; Exhibit 9 at ¶ 2. Two weeks later, he could not lift his shoulder without pain, and his left shoulder pain began to interfere with his ability to perform his job. Exhibit 7 at ¶ 7; Exhibit 9 at ¶ 4.

Petitioner maintains that he decided to seek medical attention when he realized that his shoulder was not getting better, and an internet search revealed his condition could have been caused by the vaccine he received. Exhibit 7 at ¶ 7; Exhibit 9 at ¶ 5. Because he did not have a primary care physician ("PCP"), Petitioner called an orthopedist he had seen in an advertisement, Dr. Margo. Exhibit 9 at ¶ 6. Petitioner asserts that he "had to wait several weeks for the appointment" due to his schedule and the holiday season. *Id.* He also maintains he was unable to pursue the surgery and PT recommend by Dr. Margo or to seek a second opinion due to financial concerns and his inability to take time off from work. Exhibit 7 at ¶¶ 11-13; *see* Exhibit 15 (showing the cost of Petitioner's January 13, 2017 MRI was $1,312.77).

Due to his inability to perform many of the physical aspects of his job, such as reaching overhead, Mr. Smallwood was forced to find a new job. Exhibit 7 at ¶ 14; Exhibit 9 at ¶¶ 7-8. To support these assertions, Petitioner filed an affidavit from one of his former co-workers, indicating Petitioner injured his shoulder right before the holidays in 2016, was forced to ask for help with some of his tasks, and left his job during the middle of the

---

[12] Sacroiliac means "pertaining to the sacrum and ilium; denoting the joint or articulation between the sacrum and ilium and the ligaments associated therewith." DORLAND'S at 1662.

following year. Exhibit 14. Petitioner found new employment but had to accept a position with a lower salary and relocate to Missouri. Exhibit 7 at ¶ 15; Exhibit 9 at ¶¶ 8-9; Exhibit 10 (receipts from moving expenses incurred in June 2017). He did acknowledge that his new position provides other benefits and has an incentive program. Exhibit 9 at ¶ 9.

Mr. Smallwood concedes that he obtained some relief from the PT and the dexamethasone patches prescribed to him in late 2017. Exhibit 7 at ¶ 19; Exhibit 9 at ¶¶ 10-11. He asserts that he considered returning for further treatment and requesting additional PT but did not do so because his sister, who is a pharmacist, warned him again the long-term effects of dexamethasone. Exhibit 9 at ¶ 13. Petitioner maintains that he continues to suffer from the effects of his left shoulder injury but is unable to pursue further treatment due to financial concerns. Exhibit 7 at ¶ 20; Exhibit 9 at ¶¶ 11-15. He continues to be unable to lift his left arm overhead, has developed some muscle atrophy from his inability to fully use his left arm, and has been forced to give up certain leisure activities. Exhibit 9 at ¶¶ 13-15. Although he has gotten some relief from the home exercises he continues to perform, he admits that he does not do so consistently. *Id.* at ¶ 15. Petitioner recently corresponded with another physician regarding the need for additional PT. *Id.* at ¶ 17; Exhibit 16 (email request and response from late October 2019).

## III.    Parties' Arguments

Mr. Smallwood requests that I issue a ruling finding he is entitled to compensation in this case. Pet. Motion at 1; Pet. Memo at 1. He asserts that, pursuant to Vaccine Rule 8,[13] I have the authority to issue the requested ruling on entitlement without hearing live testimony during an entitlement hearing. Pet. Memo at 1, 8.

Petitioner avers that his SIRVA attributable to the flu vaccine is an injury listed on the Vaccine Injury Table, and thus he is entitled to a presumption of causation. Pet. Memo at 1-2. Addressing each requirement for a Table SIRVA as set forth in the *Qualifications and Aids to Interpretation ("QAI")*, Petitioner maintains that his injury meets the definition of a Table SIRVA. *Id.* at 9-14; *see* 42 C.F.R. § 100.3(c)(10) (2017) (the additional QAI requirements for SIRVA). Petitioner further avers that he has suffered from his SIRVA for more than six months and has not filed a civil action or received an award or settlement for his SIRVA. Pet. Memo at 2, 14-16; *see* § 11(c)(1)(D)(i) (statutory six-month requirement); § 11(c)(1)(E) (requirement that Petitioner not have received an award or settlement of a civil action).

---

[13] The most recent version of the Vaccine Rules, located in Appendix B of the RCFC, can be found on the court's website at http://www.uscfc.uscourts.gov/sites/default/files/CFC%20Rules%2007.10.2019_1.pdf (last visited on Apr. 12, 2020).

In the alternative, Petitioner alleges that he suffered a non-Table shoulder injury caused in fact by the flu vaccine he received. Pet. Memo at 2. He "requests the opportunity to file a supportive expert report or present additional evidence should the Court deem it necessary that Petitioner proceed on his 'off-table' claim." *Id.* at 1 n.1.

Finally, "for reasons of efficient and judicial economy, . . . [Petitioner requests that I] also issue findings on pain and suffering and award damages." Pet. Memo at 16. Petitioner asserts that "he is entitled to an award of $85,000.00 in actual pain and suffering." *Id.* He asks that I award him that amount. *Id.* at 22.

Respondent recognizes that Vaccine Rule 8(d) allows me to "decide a case on the basis of written submissions." Res. Brief at 3. Quoting the language in Vaccine Rule 8(d) which states these written submissions "may include a motion for summary judgment, in which event the procedures set forth in RCFC 56[14] will apply" (*id.* at 3), Respondent applies the legal standards for summary judgment to Petitioner's case. *Id.* at 3-4 (citing RCFC 56(a) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)).  Respondent asserts that I should deny Petitioner's motion because "there is a genuine dispute as to material fact" in this case. Res. Brief at 1.

Respondent argues that Petitioner has failed to satisfy the criteria for a Table SIRVA because he has not provided preponderant evidence that he "experienced shoulder pain in the vaccinated shoulder within 48 hours of the allegedly causal vaccination." Res. Brief at 4 (citing 42 C.F.R. § 100.3(a)(XIV)(B) (Table entry for SIRVA following the influenza vaccine) and (c)(10) (additional criteria for SIRVA set forth in the QAI)). Stressing the amount of time which elapsed (almost eight weeks) before Petitioner complained of his injury and the fact that Petitioner did specify his onset was within 48 hours, Respondent maintains "[P]etitioner has not filed any reliable independent verification that onset occurred with the Table timeframe." Res. Brief at 4.

Regarding the amount of compensation sought by Petitioner, Respondent characterizes Petitioner's request as "patently unreasonable." Res. Brief at 5. He contends instead that $35,000.00 is an appropriate amount of compensation for Petitioner's pain and suffering in this case if I determine Petitioner is entitled to compensation.

---

[14] RCFC 56 sets forth the rules governing summary judgment. The Vaccine Rules "govern all proceedings before the United States Court of Federal Claims." Vaccine Rule 1(a).  Pursuant to the Vaccine Rules, "[t]he RCFC apply only to the extent they are consistent with the Vaccine Rules." Vaccine Rule 1(c). Vaccine Rule 8(d) specifically incorporates the procedures set forth in RCFC 56 when a motion for summary judgment is filed.

In his reply, Mr. Smallwood argues that Respondent has misconstrued his argument for decision. Pet. Reply at 1-2. He asserts Respondent mistakenly applies the legal standard for summary judgment to his motion for a ruling on the record. *Id.* at 2-3. While acknowledging the written submissions referenced in Vaccine Rule 8(d) *may* include a motion for summary judgement, Petitioner argues a special master's decision-making ability is not limited to that process alone. *Id.* at 3-4. Instead, he maintains, a special master may rule on the record as long as the parties have been provided the "opportunity . . . to submit arguments and evidence on the record." *Id.* at 4 (quoting *Kreizenbeck v. Sec'y of Health & Human Servs.,* 945 F.3d 1362, 1365 (Fed. Cir. 2020).

Mr. Smallwood otherwise reiterates his assertion, that he "suffered a SIRVA table injury and has met the burden for presumed causation of a vaccine injury." Pet. Reply at 7. Thus, he requests that I issue findings of fact and determine he is entitled to compensation. *Id.* at 7-8. He maintains that his injury was severe and lasted for more than a year. *Id.* at 10. Asserting that I have "the relevant facts to properly asses the pain and suffering damages in his case," he requests that I award him $85,000.00, representing compensation for his pain and suffering. *Id. at 11.*

## IV.    Ruling on the Record vs Summary Judgment

In Section 12(d) of the Vaccine Act, Congress provided guidance regarding the type of "less-adversarial, expeditious, and informal" proceeding envisioned for the Vaccine Program. § 12(d)(2)(A). This guidance was incorporated in the Vaccine Rules.

In Vaccine Rule 3, special masters are instructed "to make the proceedings expeditious, flexible, and less adversarial, while at the same time affording each party a full and fair opportunity to present its case and creating a record sufficient to allow review of the special master's decision." Vaccine Rule 3(b)(2). Pursuant to Vaccine Rule 8, "[t]he special master may decide a case on the basis of written submissions without conducting an evidentiary hearing. Submissions may include a motion for summary judgment, in which event the procedures set forth in RCFC 56 will apply." Vaccine Rule 8(d).

As the Federal Circuit explained when recently affirming my decision to rule on the written record, a special master's ability to decide a case based upon written submissions without a hearing is not limited to a motion for summary judgment. *Kreizenbeck*, 945 F.3d at 1366. Rather, "Rule 8(d) contemplates that special masters can decide cases on written submissions *other* than motions for summary judgment." *Id.* (emphasis in original). As explained in *Kreizenbeck*, special masters may rule on the record after affording the parties "a full and fair opportunity to present its case." *Id.* (citing Vaccine Rule 3(b)(2)). The "special masters must determine that the record is comprehensive and fully developed before ruling on the record." *Kreizenbeck*, 945 F.3d at 1366.

In effect, such a ruling makes evidentiary determinations based on the parties' submissions, and in so doing may weigh competing arguments about what conclusions are preponderantly supported by evidence. A ruling on the record is thus distinguishable from a summary judgment determination, that presumes facts in the non-movant's favor and only involves determining questions of law. The fact that special masters may make rulings on the record is a product of the Vaccine Act itself, which envisions efforts to streamline proceedings in order to reach faster determinations in a less adversarial manner.

In this case, Mr. Smallwood requests that I rule on the record as it now stands and find that he is entitled to compensation. Respondent maintains the record does not establish that the onset of Petitioner's shoulder pain occurred within 48 hours of vaccination. Because he disputes Petitioner's allegations regarding onset, Respondent argues that I may not rule on the record as it currently stands because the requirements for summary judgment have not been met.

Respondent's contention lacks legal support. Accepting Respondent's argument would limit the special masters' authority to decide cases based upon written submissions. But in *Kreizenbeck*, the Federal Circuit clearly stated that the special masters' authority is broader, encompassing the ability to rule on the written without hearing, under standards distinguishable from those applicable to summary judgment. Indeed, Respondent frequently requests rulings on the record in other cases, noting the authority of special masters to so decide cases. *E.g., D'Tiole v. Sec'y of Health & Human Servs.,* No. 15-0085V, 2016 WL 7664475 (Fed. Cl. Spec. Mstr. Nov. 28, 2016), *mot. for review denied,* 132 Fed. Cl. 421, *aff'd* 726 F.App'x. 809 (Fed. Cir. 2018); *Hayward v. Sec'y of Health & Human Servs.,* No. 15-0005V, 2018 WL 2772495 (Fed. Cl. Spec. Mstr. May 4, 2018); *Pope v. Sec'y of Health & Human Servs.*, *No.* 14-0078V, 2017 WL 2460503 (Fed. Cl. Spec. Mstr. May 1, 2017).

The record in this case is fully developed, and the parties have been afforded a full and fair opportunity to present their evidence and arguments. Thus, a ruling on the record as it currently stands is appropriate in this case.

## V.     Factual Findings and Ruling on Entitlement

### A.  Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. § 13(a)(1)(A). In

making this determination, the special master or court should consider the record as a whole. § 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Human Servs.,* 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[15] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. § 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. § 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> *Shoulder injury related to vaccine administration (SIRVA).* SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the

---

[15] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

shoulder (e.g. tendons, ligaments, bursae, etc). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic       studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

If, however, petitioner suffered an injury that either is not listed in the Table or did not occur within the prescribed time frame, she must prove that the administered vaccine caused injury to receive Program compensation. § 11(c)(1)(C)(ii) and (iii). In such circumstances, petitioner asserts a "non-Table or [an] off-Table" claim and to prevail, petitioner must prove her claim by preponderant evidence. § 13(a)(1)(A). The Federal Circuit has held that to establish an off-Table injury, petitioner must "prove . . . that the vaccine was not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1351 (Fed. Cir 1999). The received vaccine, however, need not be the predominant cause of the injury. *Id.* at 1351.

The Circuit Court has indicated that a petitioner "must show 'a medical theory causally connecting the vaccination and the injury'" to establish that the vaccine was a substantial factor in bringing about the injury. *Shyface,* 165 F.3d at 1352-53 (quoting *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992)). The Circuit Court added that "[t]here must be a 'logical sequence of cause and effect showing that the vaccination was the reason for the injury.'" *Id.* The Federal Circuit subsequently reiterated these requirements in a three-pronged test set forth in *Althen v. Sec'y of Health*

& *Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005). Under this test, a petitioner is required

> to show by preponderant evidence that the vaccination brought about her injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

*Id.* All three prongs of *Althen* must be satisfied. *Id.* Circumstantial evidence may be considered, and close calls regarding causation must be resolved in favor of the petitioner. *Id.* at 1280.

## B. Factual Findings Regarding QAI Criteria for Table SIRVA

Respondent does not dispute that Petitioner received the vaccine alleged as causal in his left deltoid on November 6, 2016, suffered the residual effects of his injury for more than six months, or has satisfied most of the QAI requirements for a Table SIRVA. Rather, the primary disagreement in this case involves the timing of the onset of Petitioner's left shoulder injury, specifically his pain.

### 1. Prior Condition

The first requirement under the QAIs for a Table SIRVA is a lack of a history revealing problems associated with the affected shoulder which were experienced prior to vaccination and would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i).

The medical records filed provide a comprehensive picture of the conditions suffered by Mr. Smallwood prior to and at the time of his vaccination. They establish Petitioner suffered from hypertension and diabetes from at least 2011, kidney stones in 2011, and a laceration and fracture of a finger on his left hand in 2013. Exhibit 2; Exhibit 4. In his brief, Respondent identified a few additional conditions from as early as 2007. Res. Brief at 1; *See e.g.*, Exhibit 4 at 79 (listing these earlier conditions on Petitioner's intake form). However, Respondent did not identifiy any prior issue associated with Petitioner's left shoulder and has not argued that Petitioner has failed to satisfy this requirement.

There is no evidence that Petitioner experienced any issues involving his left shoulder prior to vaccination.

### 2.   Onset of Pain

Regarding onset of a petitioner's pain, in order to meet the definition of a Table SIRVA, a petitioner must show that he experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)) and that his pain occurred within that same 48-hour period (42 C.F.R. § 100.3(c)(10)(ii) (QAI criteria)). This is the only requirement of a Table SIRVA which Respondent maintains Petitioner has failed to satisfy.

To support his position, Respondent cites the length of time that lapsed before Petitioner complained of and sought medical care for his left shoulder pain. Res. Brief at 4. After the November 6, 2016 vaccination, Petitioner was not seen for his left shoulder injury until 54 days later, on December 30, 2016. *See* Exhibit 1; Exhibit 3 at 10. But Petitioner provides several reasons for this delay. He explains that he did not have a PCP at that time, relying on the Oklahoma City Clinic for treatment and monitoring of his hypertension and diabetes. Exhibit 9 at ¶ 6. Once he determined that his left shoulder pain was not improving and performed an internet search, Petitioner decided that he required medical care. Exhibit 7 at ¶ 7; Exhibit 9 at ¶ 5. He contacted his orthopedist Dr. Margo after seeing him in an advertisement and asserts that his appointment was further delayed due to the holiday season. Exhibit 9 at ¶ 6.

It is often common for a SIRVA petitioner to delayed treatment, thinking his/her injury will resolve on its own. Respondent references Petitioner's internet search as evidence which undermines his claim of a SIRVA injury. However, it is logical to assume Petitioner may have discounted his shoulder injury until educating himself through internet research regarding SIRVA.

Respondent also stresses that when Petitioner first visited Dr. Margo, he did not specifically indicate that his left shoulder pain started within 48 hours of vaccination. Res. Brief at 4. However, at that initial visit, Petitioner reported that he had experienced left shoulder pain "since the flu shot." Exhibit 3 at 10 (emphasis added). Similarly, when Petitioner sought further treatment from another provider in November 2017 and attended PT in November and December 2017, he again reported he had experienced his left shoulder pain and limited ROM for one year since receiving the flu vaccine in November 2016. Every time Petitioner described his left shoulder pain, he linked its onset to the vaccination he received, signifying immediate onset. The simple fact that Petitioner did not use the phrase "within 48 hours" does not diminish the impact of these statements.

Although these histories were provided by Petitioner, they were relayed to medical providers for the purpose of obtaining medical treatment during the fourteen-month period after vaccination. As the Federal Circuit has noted, it is appropriate for a special master to give greater weight to evidence contained in medical records created closer in time to the vaccination, even if the information is provided as part of a medical history. *Cucuras*, 993 F.2d at 1528 (medical records are generally trustworthy evidence). The Circuit Court explained that

> Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events.

*Id.* Based upon the above, I find there is preponderant evidence which establishes the onset of Mr. Smallwood's left shoulder pain was more likely than not immediate, and thus within 48 hours of vaccination.

### 3.   Scope of Pain and Limited ROM

To establish a Table SIRVA, a petitioner's pain and reduced ROM must be limited to the shoulder in which the vaccination alleged as causal was administered.  42 C.F.R. § 100.3(c)(10)(iii).   In the medical records filed, there is no indication that Petitioner experienced pain or limited ROM in any area other than his left shoulder, and Respondent does not dispute this fact.

I find that all evidence shows Petitioner's pain and reduced ROM was limited to his left shoulder.

### 4.   Other Condition or Abnormality

The last QAI criteria for a Table SIRVA states that there must be no other condition or abnormality which would explain a petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). There is no evidence that Petitioner suffered any other condition which would explain his symptoms of pain and limited ROM in his left shoulder. Furthermore, Respondent has not argued the existence of another condition or abnormality.

I find the record contains preponderant evidence establishing that there is no other condition or abnormality which would explain the symptoms of Petitioner's left shoulder injury.

### C.  Other Requirements for Entitlement

As stated in the previous section, I find that the onset of Petitioner's left shoulder pain was immediate and thus, within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this QAI requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). Therefore, Petitioner has satisfied all requirements for a Table SIRVA and is entitled to a presumption of causation.

Even if a petitioner has satisfied the requirements of a Table injury or established causation-in-fact, however, he or she must also provide preponderant evidence of the additional requirements of Section 11(c). Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence to fulfill these additional requirements.

The vaccine record shows Mr. Smallwood received the flu vaccine in his left deltoid as alleged on November 6, 2016, at a Walgreens Pharmacy in Norman, Oklahoma. Exhibit 1 at 3-4; *see* § 11(c)(1)(A) (requiring receipt of a covered vaccine); § 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for his injury. § 11(c)(1)(E) (lack of prior civil award).

The last criteria which must be satisfied by Petitioner involves the duration of his SIRVA. For compensation to be awarded, the Vaccine Act requires that a petitioner suffer the residual effects of his or her left shoulder injury for more than six months.[16] *See* § 11(c)(1)(D)(i) (statutory six-month requirement). In this case, Petitioner received the vaccination alleged as causal on November 6, 2016. Exhibit 1. In January 2017, he was diagnosed with a rotator cuff tear for which arthroscopic surgery was recommended. Exhibit 3 at 5. When Petitioner sought treatment in November 2017, he again related his left shoulder pain to the flu vaccine he received one year prior. Exhibit 5 at 4. Petitioner attributes his need to find different employment in another state to the difficulties he encountered when performing his job in Oklahoma. Exhibit 9 at ¶¶ 7-8. He submitted receipts for his moving costs dated June 28, 2017 (Exhibit 10), and an affidavit from a co-

---

[16] In January 2017, Mr. Smallwood was diagnosed with a rotator cuff tear for which arthroscopic surgery was recommended. Exhibit 3 at 5. When he sought treatment in November 2017, he again related his left shoulder pain to the flu vaccine he received one year prior. Exhibit 5 at 4. Petitioner attributes his need to find different employment in another state to the difficulties he encountered when performing his job in Oklahoma. Exhibit 9 at ¶¶ 7-8. He submitted receipts for his moving costs dated June 28, 2017 (Exhibit 10), and an affidavit from a co-worker indicating that Petitioner's left shoulder injury was "the reason [Petitioner] left his job around the middle of the following year" (Exhibit 12 at ¶ 5).

worker indicating that Petitioner's left shoulder injury was "the reason [Petitioner] left his job around the middle of the following year" (Exhibit 12 at ¶ 5). There is therefore preponderant evidence to show Petitioner suffered the residual effects of his injury from November 6, 2016 through at least mid-December 2017.

Petitioner has established that he suffered a Table SIRVA. Additionally, he has satisfied all other requirements for compensation. I find that Petitioner is entitled to compensation in this case.

## VI.   Appropriate Amount of Damages

### A. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." § 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and

suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[17] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merrow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merrow maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

### B. Prior SIRVA Compensation

#### 1. Overview of SIRVA Case Damages Outcomes in Settled Cases[18]

SIRVA cases have an extensive history of informal resolution within the SPU since its 2014 inception. As of January 1, 2020, 1,405 SIRVA cases have informally resolved.[19] Of those cases, 817 resolved via the government's proffer on award of compensation,

---

[17] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[18] I used the term "settled" broadly, to include both cases that the Department of Justice resolves via litigative risk discussions and those it proffers (meaning the Government represents that the damages sum accurately reflects its liability under the Act in the relevant case). Prior decisions awarding damages, including those resolved by settlement or proffer, are made public and can be searched on the U.S. Court of Federal Claims website by keyword and/or by special master. On the court's main page, click on "Opinions/Orders" to access the database. All figures included in this order are derived from a review of the decisions awarding damages within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[19] Additionally, 41 claims alleging SIRVA have been dismissed within the SPU.

following a prior ruling that petitioner is entitled to compensation.[20] Additionally, 567 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $75,044.86 to $122,038.99.[21] The median award is $95,000.00. Formerly, these awards were presented by the parties as a total agreed-upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Since late 2017, the government's proffer has included subtotals for each type of compensation awarded.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $92,500.00,[22] with a median award of $70,000.00. In most instances, the parties continue to present the stipulated award as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Unlike the proffered awards, which purportedly represent full compensation for all of petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

## 2.  Specific Prior Reasoned Decisions Addressing SIRVA Damages

Additionally, since SPU's inception over five years ago there have been a number of reasoned decisions awarding damages in SPU SIRVA cases – meaning where the parties were unable to informally resolve damages, so the dispute was adjudicated and ruled upon by a special master. Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering.

### i.  Below-median awards limited to past pain and suffering

In seventeen prior SPU cases, the petitioner was awarded compensation for only actual or past pain and suffering in amounts below the median proffer figure discussed

---

[20] Additionally, there have been 21 prior cases in which petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

[21] Typical range refers to cases between the first and third quartiles.  Additional outlier awards also exist. The full range of awards spans from $25,000.00 to $1,845,047.00.  Among the 21 SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $115,772.83. For these awards, the first and third quartiles range from $90,000.00 to $160,502.39.

[22] Typical range refers to cases between the first and third quartiles.  Additional outlier awards also exist. The full range of awards spans from $5,000.00 to $509,552.31.  Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

above, and in a range from $60,000.00 to $90,000.00.[23] These cases have all included injuries with a "good" prognosis, although some of the petitioners asserted residual pain. All of the petitioners in such cases displayed only mild to moderate limitations in range of motion, and MRI imaging likewise showed only evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. The duration of injury ranged from six to 29 months, with such petitioners averaging approximately fourteen months of pain.

Significant pain was reported in these cases for up to eight months. However, in approximately half of the cases, these petitioners subjectively rated their pain as six or below on a ten-point scale. Petitioners who reported pain in the upper end of the ten-point scale generally suffered pain at this level for three months or less. Slightly less than one-half of these individuals had been administered one to two cortisone injections. Most of these petitioners pursued physical therapy for two months or less, and none had any surgery. The petitioners in *Schandel, Garrett,* and *Weber* attended PT from almost four

---

[23] These cases are: *Dagen v. Sec'y of Health & Human Servs.*, No. 18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019) (awarding $65,000.00 for actual pain and suffering and $2,080.14 for actual unreimbursable expenses); *Goring v. Sec'y of Health & Human Servs.*, No. 16-1458V, 2019 WL 6049009 (Fed. Cl. Spec. Mstr. Aug. 23, 2019) (awarding $75,000.00 for actual pain and suffering and $200.00 for actual unreimbursable expenses); *Lucarelli v. Sec'y of Health & Human Servs.*, No. 16-1721V, 2019 WL 5889235 (Fed. Cl. Spec. Mstr. Aug. 21, 2019) (awarding $80,000.00 for actual pain and suffering and $380.54 for actual unreimbursable expenses); *Kent v. Sec'y of Health & Human Servs.*, No. 17-0073V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019) (awarding $80,000.00 for actual pain and suffering and $2,564.78 to satisfy petitioner's Medicaid lien); *Capasso v. Sec'y Health & Human Servs.*, No.17-0014V, 2019 WL 5290524 (Fed. Cl. Spec. Mstr. July 10, 2019) (awarding $75,000.00 for actual pain and suffering and $190.00 for actual unreimbursable expenses); *Schandel v. Sec'y of Health & Human Servs.*, No. 16-0225V, 2019 WL 5260368 (Fed. Cl. Spec. Mstr. July 8, 2019) (awarding $85,000.00 for actual pain and suffering and $920.03 for actual unreimbursable expenses); *Bruegging v. Sec'y of Health & Human Servs.,* No. 17-0261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019) (awarding $90,000.00 for actual pain and suffering and $1,163.89 for actual unreimbursable expenses); *Pruett v. Sec'y of Health & Human Servs.*, No. 17-0561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019) (awarding $75,000.00 for actual pain and suffering and $944.63 for actual unreimbursable expenses); *Bordelon v. Sec'y of Health & Human Servs.*, No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. Apr. 24, 2019) (awarding $75,000.00 for actual pain and suffering); *Weber v. Sec'y of Health & Human Servs.*, No. 17-0399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. Apr. 9, 2019) (awarding $85,000.00 for actual pain and suffering and $1,027.83 for actual unreimbursable expenses); *Garrett v. Sec'y of Health & Human Servs.*, No. 18-0490V, 2019 WL 2462953 (Fed. Cl. Spec. Mstr. Apr. 8, 2019) (awarding $70,000.00 for actual pain and suffering); *Attig v. Sec'y of Health & Human Servs.,* No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019) (awarding $75,000.00 for actual pain and suffering and $1,784.56 in unreimbursable medical expenses); *Dirksen v. Sec'y of Health & Human Servs.*, No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursable medical expenses); *Kim v. Sec'y of Health & Human Servs.*, No. 17-0418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); *Knauss v. Sec'y of Health & Human Servs.,* No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Marino v. Sec'y of Health & Human Servs.,* No. 16-0622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Desrosiers v. Sec'y of Health & Human Servs.*, No. 16-0224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses).

to five months, but most of the PT in *Weber* focused on conditions unrelated to the petitioner's SIRVA.   Several of these cases (*Goring, Lucarelli, Kent, Knauss*, *Marino*, *Kim*, and *Dirksen*) included a delay in seeking treatment. These delays ranged from about 42 days in *Kim* to over six months in *Marino*.

### ii.   Above-median awards limited to past pain and suffering

In eight prior SPU cases, the petitioner was awarded compensation limited to past pain and suffering but above the median proffered SIRVA award, in ranges from $110,000.00 to $160,000.00.[24] Like those in the preceding group, the relevant petitioner's prognosis was "good," but these higher award cases were characterized either by a longer duration of injury or by the need for surgical repair. Thus, seven out of eight underwent some form of shoulder surgery, while one (*Cooper*) experienced two full years of pain and suffering, eight months of which were considered significant, and also required extended conservative treatment. On the whole, MRI imaging in these cases also showed more significant findings, with seven of eight showing possible evidence of partial tearing.[25] No MRI study was performed in the *Cooper* case.

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale, and all experienced moderate to severe limitations in

---

[24] These cases are: *Nute v. Sec'y of Health & Human Servs.*, No. 18-0140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019) (awarding $125,000.00 for pain and suffering); *Kelley v. Sec'y of Health & Human Servs.*, No. 17-2054V, 2019 WL 5555648 (Fed. Cl. Spec. Mstr. Aug. 2, 2019) (awarding $120,000.00 for pain and suffering and $4,289.05 in unreimbursable medical expenses); *Wallace v. Sec'y of Health & Human Servs.*, No. 16-1472V, 2019 WL 4458393 (Fed. Cl. Spec. Mstr. June 27, 2019) (awarding $125,000.00 for pain and suffering and $1,219.47 in unreimbursable medical expenses); *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses); *Knudson v. Sec'y of Health & Human Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); *Cooper v. Sec'y of Health & Human Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); *Dobbins v. Sec'y of Health & Human Servs.*, No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); *Collado v. Sec'y of Health & Human Servs.*, No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses).

[25] In *Reed*, MRI showed edema in the infraspintus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head.  In *Dobbins*, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspects of the inferior glenohumeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies.  In *Collado*, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus. In *Knudson*, MRI showed mild longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.

range of motion. Moreover, these petitioners tended to seek treatment of their injuries more immediately (e.g., within five to 45 days from onset). Duration of physical therapy ranged from one to 28 months and six out of the eight had cortisone injections.

### iii. Awards including compensation for both past and future pain and suffering

In only three prior SPU SIRVA cases has a petitioner been awarded compensation for *both* past and future pain and suffering.[26] In two of those cases (*Hooper* and *Binette*), petitioners experienced moderate to severe limitations in range of motion and moderate to severe pain. The *Hooper* petitioner underwent surgery, while in *Binette* petitioner was deemed not a candidate for surgery following an arthrogram. Despite significant physical therapy (and surgery in *Hooper*), medical opinions indicated that the relevant petitioner's disability would be permanent. In these two cases, petitioners were awarded above-median awards for actual pain and suffering as well as awards for projected pain and suffering for the duration of their life expectancies. In the third case (*Dhanoa*), petitioner's injury was less severe than in *Hooper* or *Binette*; however, petitioner had been actively treating just prior to the case becoming ripe for decision and her medical records reflected that she was still symptomatic despite a good prognosis. These petitioners were awarded an amount below-median for actual pain and suffering, but, in light of the facts and circumstances of the case, also awarded projected pain and suffering.

### C. Appropriate Compensation in this SIRVA Case

In this case, awareness of the injury is not disputed. The record reflects that at all times petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of petitioner's injury.

### 1. Duration

The medical records show that Petitioner suffered left shoulder pain and limited ROM from early November 2016 through at least mid-December 2017. During this time,

---

[26] These cases are: *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); *Binette v. Sec'y of Health & Human Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses); *Hooper v. Sec'y of Health & Human Servs.*, No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering, $37,921.48 for lost wages).

he obtained little relief from his symptoms until he attended seven PT sessions for approximately one month at the end of 2017 (over a year from onset). At his last PT visit on December 14, 2017, Petitioner reported overall improvement of 60 to 75 percent improvement in his ROM. Exhibit 6 at 1. His level of pain had reduced to 0 out of 10, no more than 4 out of 10 after a full day of work. *Id.* When Petitioner was discharged from PT, it was noted that he had met all goals. However, he was instructed to continue his exercises at home. *Id.* at 2-3.

When Petitioner sought chiropractic treatment for his lower back pain in early 2018, however, he did not mention any left shoulder issues or pain. He described his lower back pain as sharp and located more on his right side. At his first chiropractic visit on February 12, 2018, he reported the onset of his lower back pain was sudden. Exhibit 8 at 5. He did not attribute his lower back pain to his left shoulder SIRVA.

Although Petitioner claims that he continues to have difficulties using his left arm and has suffered some muscle atrophy attributable to his SIRVA, he does not mention his lower back pain in his affidavits, memorandum, or reply. Additionally, he has not provided evidence to link this lower back pain, experienced in 2018, to his left shoulder SIRVA.

Frankly admitting that he has not consistently performed his home exercises, Petitioner maintains that he continues to suffer some symptoms of his SIRVA. I generally find Petitioner's allegations regarding the onset of his pain and the severity of his symptoms to be consistent and credible. Nevertheless, he has failed to provide evidence to support his allegations of *continued* or ongoing pain and limited ROM.

Taking all of the above into account, I find that Petitioner suffered the symptoms of his SIRVA from the November 2016 vaccination through at least December 2017. He received significant improvement in his symptoms while attending PT for one month, from November 15, 2017 through December 14, 2017.

### 2.  Severity

When Petitioner was first treated for his left shoulder pain, he described pain on the outside of his shoulder and an inability to raise his left arm overhead. Exhibit 3 at 10. At his next visit, eight days later, he reported temporary relief from the injection he received on December 30, 2016 but indicated that his pain was returning. *Id.* at 8. By that visit, he rated his level of pain as the same but did not indicate what that level was. *Id.* Petitioner was seen once more by that provider, his orthopedist Dr. Margo, on January 17, 2017. *Id.* at 5. Although these records do not provide the exact level of Petitioner's pain, they do establish that his pain was extensive enough to cause limited ROM.

Additionally, the results of Petitioner's January 13, 2017 MRI showed he was suffering from a rotator cuff tear for which surgery was recommended. *Id.* at 5-7.

Petitioner's medical records demonstrate that he continued to experience left shoulder symptoms in the summer of 2017, when he was forced to start a new job in a different state. Exhibit 9 at ¶ 5; Exhibit 10. When he sought treatment in November 2017, approximately one year after vaccination, Petitioner described his pain as severe, constant, and sharp. Exhibit 5 at 4. At his first PT session a few weeks later, he rated his level of pain as 0 at best and 10 at worst. Exhibit 6 at 16. The physical therapist observed "<u>significant</u> limitation in [Petitioner's] ROM." *Id.* at 19 (emphasis added). Over the next month, Petitioner made good progress while attending seven sessions of PT. *See* Exhibit 6.

Mr. Smallwood has provided a valid reason for his reluctance to seek additional treatment from January through November 2017 - specifically the cost of his medical care. Exhibit 7 at ¶¶ 11, 16; Exhibit 9 at ¶ 3. As a self-employed independent contractor, it would have been difficult for Petitioner to cover his medical costs, such as the $1,312.77 charged for his MRI. Exhibit 15. Additionally, Petitioner may have thought changing to a less strenuous job would help his injury resolve without the recommended surgery. Still, the fact that he did not seek medical treatment during this time does suggest that his pain and limited ROM was less severe than in November 2017, when he again sought treatment. *See Marino,* 2018 WL 2224736, at *8.

The overall record reveals that Petitioner exhibited at least moderate pain and limitation in movement during the year following vaccination. By the time he sought treatment again in November 2017, it appears his pain was severe enough for him to desire medical assistance. At that time, the limitation in his ROM was assessed as significant, but Petitioner obtained considerable relief from one month of PT. By his last PT session on December 14, 2017, Petitioner's left shoulder injury was 60 percent improved. Exhibit 6 at 1. He was experiencing no pain, and only pain at a level of 4 out of 10 after a full day's work. *Id.*

### 3. Comparison to Other Awards

The circumstances in Petitioner's case are most like those experienced by the petitioner in the *Kent* case, with two main differences. Although the *Kent* petitioner suffered the symptoms of her SIRVA for a total of approximately ten months, she suffered the most significant levels of pain for only the first six months. *Kent,* 2019 WL 5579493, at *11. However, even when her pain diminished, she still rated the severity of her pain as four to seven out of a scale of ten. *Id.* at *3-4. Secondly, the petitioner in *Kent* attended almost five times the number of PT sessions over a longer period of five months. *Id.* at

*3-5, 13. As the petitioner in the *Kent* case was awarded $80,000.00 for her past pain and suffering, it is reasonable to award the Petitioner in this case close to that same amount (albeit with some downward adjustment to account for the slightly lessened severity here). *Id.* at *14.

At the same time, Petitioner's injury was comparable to the SIRVAs suffered by many of the petitioners who have been awarded $75,000.00 for their past pain and suffering. Although many of these petitioners sought medical treatment much earlier than the Petitioner in this case, they suffered the symptoms of their SIRVAs for a shorter time period. *Capasso*, 2019 WL 5290524; *Pruett v. Sec'y of Health & Human Servs.*, No. 17-0561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019), *Bordelon,* 2019 WL 2385896; *Attig,* 2019 WL 1749405. For example, the petitioner in *Bordelon* reported her shoulder pain to her PCP within 15 days. 2019 WL 2385896, at *5. However, she suffered a more severe level of pain for only two months and a lower level of pain for six months thereafter. *Id.* at *6. Additionally, the results of the *Bordelon* petitioner's MRI revealed tendinosis and a small amount of fluid in her bursa but no rotator cuff tear. *Id.* at *7. Like the Petitioner in this case, the *Bordelon* petitioner received one cortisone injection. *Id.* at *5. However, she did attend twice the number of PT sessions over double the amount of time. *Id.* at *7-8.

Petitioner's SIRVA symptoms are also comparable to petitioners who received less than $75,000.00 for their SIRVAs, although the severity might be slightly greater in this case. The petitioner in *Garrett* was awarded $70,000.00 for his past pain and suffering but never reported pain above 5 on a scale of 10. 2019 WL 2462953, at *8. Additionally, the duration of the *Garrett* petitioner's SIRVA was "relatively short," six months. *Id.* at *9. The petitioner in *Dagen* was awarded $65,000.00 for his past pain and suffering but experienced his SIRVA symptoms for only seven months. 2019 WL 7187335, at *10. Additionally, like the petitioner in *Bordelon*, the MRI results of the *Dagen* petitioner revealed only mild tendinitis and bursitis. *Id.* at *3.

As indicated in his memorandum, Petitioner seeks only $85,000.00 for his past pain and suffering. Respondent argues that he should be awarded only $35,000.00. Reviewing all evidence in this case, I find that Petitioner is entitled to compensation in the amount of $72,500.00 for his past pain and suffering.

## VII.   Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that Petitioner's left shoulder injury meets the definition for a Table SIRVA. Thus, causation is presumed, and Petitioner is entitled to compensation in**

**this case. Furthermore, I find that $72,500.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[27]

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $72,500.00 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act.

The clerk of the court is directed to enter judgment in accordance with this decision.[28]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[27] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required.  *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[28] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.